Mr. Justice Bobb
delivered the opinion of the Court:
1. The fundamental question which we are called upon to ■consider is whether good faith was practised in procuring the signatures of complainants to the challenged fee agreement and ■deed of trust, or whether those signatures were obtained as the result of misrepresentations amounting to fraud. This question necessarily must be determined upon the evidence before us, which we will now briefly review.
Peter Dill died December 18th, 1897. The executors of his will were two lawyers, and, according to the will, friends of the testator. The value of the estate, consisting of realty, is conceded to have been about $10,000. Testator’s wife was made tenant for life, with remainder over to complainants in fee. The will was seasonably filed by the executors, and steps were also taken by them to procure the probate thereof. On the 4th of March, 1898, a caveat was filed by nonresident collateral heirs. This caveat, as we have seen, was subsequently Abandoned, leaving no contest whatever against the probate of the will.
It is apparent that the utmost good faith was not practised in procuring the signature of the widow Dill to these papers. She was almost seventy-eight years old when Mr. Lewis and Mr. Adriaans, on August 30th, 1898, appeared at her home. At that time the executors had done all that in reason they should have done towards the probate of the will. Mr. Adriaans and Mr. Lewis knew that the estate could not be settled within •one year from the death of the testator. They knew, or should have known, that the executors had qualified as such and were not remiss in their duty; and yet we find these two lawyers representing to this old lady that their services were necessary because of the nonaction of the executors, and we find them *72 obtaining her signature to a contract calling for one fifth of the estate in the event they succeeded in overcoming the opposition to the probate of the will. At this time they either knew, or easily might have ascertained, the character of that opposition. That they misled Mrs. Dill as to the situation is apparent. What followed ? Her son, the father of complainants, with his family, resided in Baltimore. He was then stricken with a fatal disease, from which he died in the November following. His wife, as appears from her testimony and from other evidence before us, was a woman little versed in the affairs of life. The children were all minors save one. Neither of the parents nor the minor children had ever seen, or, so far as this record discloses, heard, of these attorneys. Mr. Adriaans, armed with a letter from the widow Dill, appeared upon the scene. He, of course, realized that his contract and deed of trust were valueless without the signatures of the remaindermen. It was therefore greatly to his interest to obtain them. He was fully advised as to the conditions surrounding the probate of the will;. they knew little or nothing about it. Mrs. Dill’s letter requested the signing of the papers which he had with him. Supplementing that request he admits that he told this stricken son and his wife that their mother “was in a distressed condition financially, and that she had told him (Adriaans) that she needed money, and that she would be able to get money if the probate of the will could be procured, and it was for this purpose that we were to make the defense of the will, to enable her to raise money to live upon.” He did not tell them the value of the estate; that the executors were lawyers; that these executors were then proceeding with reasonable despatch towards the probate of the will; that the signing of the papers meant so much additional and probably needless'expense. On the contrary, he played upon their sympathies and suppressed the facts which he should have disclosed. We shall not dwell upon the testimony of the mother of complainants and that of her children other than William P., who was of age when he signed these papers. We are fully convinced, from that testimony and the testimony of Mr. Adriaans, that the signatures *73 of tibe minor children were procured as the result of misrepresentations; that the children did not know, and Mr. Adriaansdid not intend they should know, the real character and purport of the papers they were signing. The letter of June 1st, 1900,. from the mother of complainants, contradicts rather than supports the defendant, for it is apparent that it was the then understanding of Mrs. Dill that Mr. Lewis and Mr. Adriaans were representing Mrs. Ann Dill, and not her or her children.
Having obtained the signatures of William P. Dill’s father, mother, brothers, and sisters, Mr. Adriaans repaired to the place of employment of this complainant. Mr. Adriaans does not contend that he read the papers to William, nor does he-contend that he made him acquainted with the contents thereof, owing to the presence of third parties. Mr. Adriaans’s testimony contains the significant statement that when William “saw the signatures of his brothers and sisters and his father and mother,” he signed the papers. William testified, it will be remembered, that Mr. Adriaans told him that the object of the papers was the relief of his grandmother; that Mr. Adriaans further told him that it was the request of his father-that he sign, and that thereupon, without reading the papers, he signed them. It is apparent that this complainant was deceived into signing the papers and that the deception practised, considering the circumstances and relative positions of the parties, amounted to fraud. While Mr. Adriaans testifies that William read, or might have read, the papers, he does not deny that it was with considerable difficulty that he even obtained William’s presence in the office. Nor does he deny that the immediate superior of Mr. Dill was standing near and apparently waiting for him. The situation, therefore, was such that any representations made by Mr. Adriaans were very likely,, as he well knew, to be accepted and acted upon. Can there be any doubt that had Mr. Adriaans acquainted this complainant with the true situation, instead of making the representations which he did make, complainant would have declined to sign the papers? This is the test, and there can be but one-answer to the question.
*74 2. Two of the complainants, at the time of the filing of the bill, were under age. The defendant contends that they could .not disaffirm the contract and deed securing it during infancy, .and that therefore there has been a misjoinder of parties.
We have found this contract and deed to be the fruit of bad faith, and hence void. This finding brings the case within the ruling in Fridge v. State, 3 Gill & J. 103, 20 Am. Dec. 463; Ridgeley v. Crandall, 4 Md. 442; Monumental Bldg. Asso. No. 2 v. Herman, 33 Md. 134, to the effect that a contract that a -court can see and pronounce to be to the prejudice of the infant is void. There can be no doubt that had the defendant in 1900, at which time he claims to have performed his part of the • contract, attempted to enforce that contract to the prejudice of these infants, equity would have had jurisdiction to stay his .hands. The object of the general rule deferring the act of avoidance until the coming of age of the infant is his protection. When, therefore, it is apparent to the court that delay will work injury to the infant, the power of repudiation may be •exercised immediately. Tyler, Infancy, sec. 29. In Andrews v. Hall, 15 Ala. 85, it was held that the guardian ad litem of .-an infant might, with the concurrence of the orphans’ court, 'bring into the estate of an intestate advancements to the infant, and claim for the infant his or her share of the estate. "The court said: “It was the duty of the guardian ad litem in this case, to present to the court the right of his ward to contribution, and the circumstances and conditions connected with it, so that the court could protect him by making the election which was essential to his interest.” Why, then, may not a court of equity, in a ease like the present, avoid a multiplicity • of suits, and protect the interests of infant parties to a contract •by permitting their guardian or next friend to represent them ? We know of no reason. Surely a court of equity has the power, when it is apparent that infants are the victims of deceit, to award them the same relief that it is ready to award adults.
3. Complainants are not guilty of laches. While the deed •■of trust was recorded two years after its execution, complainants, living in Maryland, and having no actual knowledge that *75 they had signed such an instrument, could not be charged with laches until something occurred which should have led them to make inquiry; in other words, until they had some reason to suspect the injury done them. George v. Ford (present term) 36 App. D. C. 315. Inasmuch as complainants did not discover the wrong that had been done them until late in 1907 •or early in 1908, and almost immediately took steps looking to the bringing of the bill herein, which was filed within a year, it is apparent that they cannot be charged with unreasonable delay. Halstead v. Grinnan, 152 U. S. 412, 38 L. ed. 495, 14 Sup. Ct. Rep. 641. They had no representative here, and there is no testimony that anything occurred between the time when they signed the papers and the time when Mr. Dumler was sent over here to see about the settlement of their grandfather’s estate to lead them to suspect the real nature of those papers. Mr. Adriaans recorded his deed and quietly awaited developments. He said nothing and did nothing likely to put complainants upon inquiry, and, so far as the record discloses, neither did Mr. Lewis. Notice ought never to be imputed to the victim of a deception unless his failure to obtain actual notice was the result of his own negligence; in other words, he who practises bad faith ought not to be permitted to invoke the doctrine of constructive notice in aid of his wrongdoing, unless, as above suggested, negligence on the part of the injured party has supervened.
One point remains. It was suggested in argument that the •defendant is at least entitled to remuneration for the services actually performed by him to the benefit of the complainants, and that the court should have referred the case to the auditor for the ascertainment of the value of those services. The defendant in his answer, however, did not offer to accept compensation for services actually performed, as did his codefendant Lewis, but insisted on the letter of his contract. That contract being tainted with bad faith, we do not feel justified, upon the meager evidence before us, in prolonging this contest. We are not convinced that any necessary and valuable services 'were rendered complainants by the defendant.
The decree is affirmed, with costs. Affirmed.